**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

| | | |
|---|---|---|
| STOURBRIDGE INVESTMENTS LLC, Derivatively on Behalf of Nominal Defendant OMEGA HEALTHCARE INVESTORS, INC., | : : : : : : | |
| Plaintiff, | : : | Case No. |
| v. | : : | **VERIFIED SHAREHOLDER** |
| CRAIG R. CALLEN, KAPILA K. ANAND, CRAIG M. BERNFIELD, NORMAN R. BOBINS, BARBARA B. HILL, EDWARD LOWENTHAL, BEN W. PERKS, C. TAYLOR PICKETT, STEPHEN D. PLAVIN, ROBERT O. STEPHENSON, and DANIEL J. BOOTH, | : : : : : : : : : | **DERIVATIVE COMPLAINT FOR VIOLATION OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| Defendants, | : : | |
| and | : : | |
| OMEGA HEALTHCARE INVESTORS, INC., | : : : | |
| Nominal Defendant. | : : | |

_____:

Plaintiff Stourbridge Investments LLC ("Plaintiff"), by and through Plaintiff's undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant Omega Healthcare Investors, Inc. ("Omega" or the "Company"), against certain of the Company's officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (as defined below) violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, abuse of control, and gross mismanagement. Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which includes without limitation: (a)

1

review and analysis of public filings made by Omega and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on Celgene's website; (c) review of the pleadings and other documents in the securities class actions captioned *In re Omega Healthcare Investors, Inc. Securities Litigation*, Case No. 17-cv-08983-NRB (S.D.N.Y.) (the "Related Securities Action"); and (d) review of other publicly available information concerning Omega and the Defendants.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action on behalf of Nominal Defendant Omega seeking to recover damages caused by Defendants' violations of the federal securities laws, breaches of fiduciary duties, abuse of control, and gross mismanagement as a result of Defendants causing the Company to issue materially misleading statements and/or omitting material information concerning the Company's financial health from about April 25, 2017 until the present (the "Relevant Period").[1]

2.      The Company is a self-administered real estate investment trust (REIT) investing in healthcare facilities such as skilled nursing facilities and assisted living facilities.  Omega provides lease or mortgage financing to these various healthcare facilities, which in turn generates a return on investment for the Company's shareholders through the collection of rent and/or mortgage payments paid by the operators of the healthcare facilities. Omega's largest operators each manage dozens of facilities.

3.      Due to this model, the Company's ability to pay dividends to its shareholders is dependent largely on the ability of its healthcare facilities' operators to pay rent, as it impacts the

---

[1] The false and misleading statements were issued in the Company's public filings from approximately April 25, 2017 to October 31, 2017; however, the wrongs complained of herein continue through to the present as Omega's internal controls remain deficient.

Company's bottom line.  Further, in the event of a troubled or failing facility, the process of finding a new operator is an expensive and lengthy process.

4.      As such, the financial health and quality of Omega's operators is closely monitored and focused on by investors.  It is therefore critical that the Company issue prompt disclosures to the market when one (or more) of its operators face problems that could materially impact Omega's reported earnings.  This is doubly true for its largest operators.

5.      Orianna Health Systems ("Orianna") was, as of December 31, 2016, Omega's second largest operator, operating 59 facilities across the country. Omega's investment in the Orianna facilities represents nearly 7% of its overall investment portfolio, with a gross investment of over $619 million.

6.      Due to a variety of factors, Orianna experienced a number of operational pressures in 2016 and early 2017 that dramatically affected its profitability and, critically, disabled it timely from paying its rent to Omega. In 2016, Omega knew, but did not disclose, that Orianna's difficulties caused it to change its management, wholesale, implement material operational andcultural changes, and to attempt to sell off seven Orianna facilities in the northwest United States. By March, 2017, Omega and Orianna had succeeded in selling six of seven of those facilities.

7.      It was not until Omega's May 4, 2017 earnings conference call that Defendants disclosed to the market, in general terms, the struggles Orianna faced in 2016 as well as the measures Orianna and Omega took to return Orianna to stability.  However, on the call, Defendants portrayed Orianna as being on the road to recovery, including generating cash flow enough to cure rent delinquencies and return Orianna to current status on its payments to the Company.

8.      The May 4, 2017 conference call did not reveal, however, that by the spring of 2017

3

Orianna's financial situation was in such dire straits that it was delinquent on both material rent payments to the Company in addition to its own real estate taxes.

9.      The Company further concealed that in response to Orianna's struggles, on May 2, 2017, pursuant to a Working Capital Agreement it lent Orianna $18.8 million, *just two days before the May 4, 2017 earnings conference call*, which Orianna used mainly to pay delinquent real property taxes and *to use Omega's own cash to make rent payments to Omega,* reducing Orianna's delinquencies.

10.     This loan to Orianna allowed the Company to misrepresent that the money it loaned to Orianna was actually revenue from rent, leading to a material misstatement of Omega's Funds from Operations ("FFO") and Adjusted Funds from Operations ("AFFO") in the first and second quarters of 2017.

11.     Orianna's financial condition deteriorated to such a degree that Omega could no longer hide it from the market, and in its reported earnings for the third quarter of 2017, Omega recorded a $194.7 million impairment on its direct financing leases with Orianna, along with $9.5 million in provision for uncollectible accounts related to Orianna. Further, Orianna reported a $46.8 million loss in FFO for the third quarter of 2017.

12.     As a result of this news, the price of the Company's shares fell $2.11 per share, or 6.8%, from an October 30, 2017 close of $30.97 to an October 31, 2017 close of $28.86 per share on relatively enormous volume of 16.2 million shares traded, directly and proximately causing Plaintiffs and other Class members to suffer damages.

13.     The Company's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company, as a majority of them do not have the requisite level of disinterestedness and independence in light of their conduct, as set forth further

herein.

14.     The Company and its shareholders have been substantially damaged as a result of Defendants knowing or highly reckless breaches of fiduciary duty and other misconduct alleged herein.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. §1331 because the claims arise under and pursuant to §14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 promulgated there under (17 C.F.R. §240.14a-9).

16.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

17.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## THE PARTIES

18.     Plaintiff has been at all relevant times a shareholder of Omega common stock and has continuously held Omega common stock throughout the present date.

19.     Nominal defendant Omega is a Maryland corporation with its principal executive offices located at 200 International Circle, Suite 3500, Hunt Valley, Maryland 21030.  Omega's stock trades on the New York Stock Exchange under the ticker symbol "OHI."

20.     Defendant Craig R. Callen ("Callen") has been a member of the Company's Board since 2013 and its Chairman since June 2017.  Defendant Callen is a member of the Board's Audit Committee and Nominating and Corporate Governance Committee.

21.     Defendant Kapila K. Anand ("Anand") has been a member of the Company's Board since 2018.

22.     Defendant Craig M. Bernfield ("Bernfield") has been a member of the Company's Board since 2015.  Defendant Bernfield is the Chairman of the Board's Investment Committee and a member of its Nominating and Corporate Governance Committee.

23.     Defendant Norman R. Bobins ("Bobins") has been a member of the Company's Board since 2015.  Defendant Bobins is a member of the Board's Investment Committee.

24.     Defendant Barbara B. Hill ("Hill") has been a member of the Company's Board since 2013.  Defendant Hill is a member of the Board's Compensation Committee.

25.     Defendant Edward Lowenthal ("Lowenthal") has been a member of the Company's Board since 1995.   Defendant Lowenthal is the Chairman of the Board's Compensation Committee, as well as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

26.     Defendant Ben W. Perks ("Perks") has been a member of the Company's Board since 2015.  Defendant Perks is the Chairman of the Board's Audit Committee.

27.     Defendant C. Taylor Pickett ("Pickett") has been a member of the Company's Board since 2002 and has been the Company's Chief Executive Officer ("CEO") since 2001. Defendant Pickett is a member of the Board's Investment Committee.  In his role as the Company's CEO, Defendant Pickett received $5,983,244 in total compensation for fiscal year 2017.[2]

28.     Defendant Stephen D. Plavin ("Plavin") has been a member of the Company's Board since 2000.  Defendant Pavin is the Chairman of the Board's Nominating and Corporate

---

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation, and all other compensation.

6

Governance Committee and a member of its Audit Committee and Compensation Committee.

29.     Defendants Callen, Anand, Bernfield, Bobins, Hill, Lowenthal, Perks, Pickett, and Plavin are collectively referred to herein as the "Director Defendants."

30.     Defendant Robert O. Stephenson ("Stephenson") has been the Company's Chief Financial Officer ("CFO") since August 2001.

31.     Defendant Daniel J. Booth ("Booth") has been the Company's Chief Operating Officer ("COO") since October 2001.

32.     Defendants Stephenson and Booth, along with the Director Defendants, are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

33.     Omega is a self-administered REIT investing in income producing healthcare facilities, including long-term care facilities located in the United States and the United Kingdom.

34.     The Company provides lease or mortgage financing to operators of healthcare facilities, the majority of which are skilled nursing facilities ("SNFs").  SNFs provide nursing care by registered professional nurses, bed and board, physical therapy, occupational therapy, speech therapy, social services, medications, supplies, equipment, and other services necessary to the health of the patient. In addition to SNFs, the Company provides lease and mortgage financing to assisted living facilities ("ALFs"), independent living facilities and rehabilitation and acute care facilities.

35.     According to the Company, its relationship with operators is typically through triple-net operating leases, which typically range from 5-15 years in duration, though some may be shorter or longer.  Pursuant to these leases, the respective operators are responsible for all the

leased facilities' expenses.  A small portion of Omega's leases are accounted for as direct financing leases.

36.     Omega's real estate investments, as of December 31, 2016, included properties managed by a total of 79 different operators, who the Company refers to as "our tenants and mortgagors and their affiliates who manage and or operate our properties."

37.     As of December 31, 2016, Orianna operated 59 of Omega's facilities throughout the United States. The Company reported the gross real estate investment in the Orianna facilities as $619,281,496, or nearly 7% of the Company's total investment portfolio.   Indeed, the Company's public filings note only one operator with which it has a larger total investment, Ciena Healthcare, with a total investment of $910,430,967.

38.     Signature Healthcare ("Signature"), another of the Company's operators, has a larger number of facilities than Orianna (63 to 59), but represents a smaller overall investment to the Company of $557,985,685 as of December 31, 2016.  As such, Orianna is the Company's second largest investment monetarily.

39.     Several master lease agreements governed Orianna's relationship with the Company, setting forth the lease obligations of a number of Orianna facilities.  In March 2018, when Orianna sought bankruptcy protection for its restructuring, Omega (through its affiliates), was a party to multiple active master leases with Orianna facilities.

40.     While the Company does not directly operate the medical facilities in which it invests, it provides financing to the various entities that operate those facilities throughout the country. As such, the Company delivers investment returns to its shareholders through collection of rent and mortgage payments from these entities operating the facilities, relying upon those operators to run their facilities profitably, and to comply with the various legal and regulatory

obligations faced by SNFs and ALFs. Due to the various legal and operational complexities of running large numbers of SNFs, along with the limited number of large operators in the industry, it is imperative for the Company to be aware of problems with its operators, as finding new operators for its facilities is a lengthy and costly task.  As such, the Company's leases with its operators, including Orianna, do far more than merely set forth the terms of a lease and other the rental obligations.   The Company protects its investments by ensuring it is well-informed about its operators' financial condition, and that its investments are secured by multiple forms of collateral:

> We seek to obtain (i) contractual rent escalations under long-term, non-cancelable, "triple-net" leases and (ii) fixed-rate mortgage loans. We typically obtain substantial liquidity deposits, covenants regarding minimum working capital and net worth, liens on accounts receivable and other operating assets, and various provisions for cross-default, cross-collateralization and corporate and or personal guarantees, when appropriate.

2016 annual report on Form 10-K ("2016 10-K"), filed with the SEC on February 24, 2017.

41.     Similarly, investors and analysts understand the importance of operators health and were rightfully concerned about the risk to the Company's losing operators.  For example, on May 4, 2017, Hilliard Lyons analyst John Roberts issued a generally positive report on Omega, noting that management had "retained its FFO guidance for 2017 at $3.40-$3.44 a share. . . ." Additionally, regarding certain justice department investigations and the potential "headline risk" to which this exposed the Company, Mr. Roberts described it as constituting a "fundamental risk" to the Company, but noted that "[i]nvestors always worry about a REIT's ability to find a new tenant when one leaves, and we believe that OHI management is very capable of doing just that, replacing a problem tenant with a new one, if any investigation were to result in such an issue."

42.     On March 6, 2018, in its motion seeking to obtain post-petition financing from the Company during its bankruptcy restructuring ("DIP Financing Motion"), Orianna identified five master leases between its affiliates and the Company: (i) the SE Master Lease governing facilities

in the southeast region; (ii) the IN Master Lease, governing facilities in Indiana;  (iii) the SC/GA Master Lease, governing facilities in South Carolina and Georgia; (iv) the NW Master Lease, governing facilities in the northwest region; and (v) the TX Master Lease, governing facilities in Texas.

43.    In late 2016 and early 2017, Orianna faced severe financial issues with cash flow and liquidity, thereby experiencing difficulty both paying vendors and meeting its rent obligations to the Company.  Prior to the Relevant Period, the Company was in fact well aware of these issues. Indeed, in its 2016 10-K, the Company described its process for reviewing collectability of accounts receivable:

> ***On a quarterly basis, we review our accounts receivable to determine their collectability.*** The determination of collectability of these assets requires significant judgment and is affected by several factors relating to the credit quality of our operators that we regularly monitor, including (i) payment history, (ii) the age of the contractual receivables, (iii) the current economic conditions and reimbursement environment, (iv) the ability of the tenant to perform under the terms of their lease and/or contractual loan agreements and (v) the value of the underlying collateral of the agreement. If we determine collectability of any of our contractual receivables is at risk, we estimate the potential uncollectible amounts and provide an allowance. In the case of a lease recognized on a straight-line basis, a mortgage recognized on an effective yield basis or the existence of lease inducements, we generally provide an allowance for straight-line, effective interest, and/or lease inducement accounts receivable when certain conditions or indicators of adverse collectability are present. If the accounts receivable balance is subsequently deemed uncollectible, the receivable and allowance for doubtful account balance are written off.

(Emphasis added).

44.    Additionally, Omega disclosed in its 10-Q for the quarter ending March 31, 2017, filed with the SEC on May 5, 2017 (the "May 5 10-Q") that in March 2017 it had executed sales agreements to sell Orianna's 7 northwest facilities to new operators.  As such, by March 2017 at the latest, the Company was aware that Orianna's financial situation had become dire and required that the Company take action in order to protect its second largest investment.

45.     Omega claimed to be constantly vigilant about the ability of its operators to meet their rent and/or mortgage obligations. Both before and throughout the Relevant Period, the Company focused on the pressures faced by numerous operators that had the potential to affect those operators' liquidity, and thus, their ability to meet financial obligations with Omega pursuant to their lease agreements.

46.     For example, in the Company's conference call to discuss the First Quarter 2017 financial results, held on May 4, 2017, Defendant Booth described the state of Omega's asset portfolio, as follows:

> As of March 31, 2017, Omega had an operating asset portfolio of 972 facilities, with approximately 99,000 operating beds.
>
> These facilities were spread across 77 third-party operators and located within 41 states and the United Kingdom. Trailing 12-month operator EBITDARM and EBITDAR coverage for our portfolio increased slightly during the fourth quarter of 2016 to 1.69x and 1.33x, respectively versus 1.68x and 1.31x, respectively for the trailing 12-month period ended September 30, 2016. The pressures on portfolio performance experienced in 2016, such as increased labor costs and decreased lengths of stay have begun to show some signs of stability in the fourth quarter results, as well as year-to-date results in the first quarter.

47.     Defendant Booth went on to discuss the operational struggles Orianna faced (failing to mention Orianna by name) in 2016, touting the Company's hands-on approach to correcting Orianna's problems:

> One private top 10 operator, of note, however, felt the performance pressure more than most. This was exacerbated in 2016 by complete replacement of senior management early in the year.
>
> The new management team well known and respected by Omega worked throughout 2016 to transform the culture of the company, which included changing out many facility-level management teams. During this transition period, the company's operational performance suffered such that the portfolio dipped below 1x EBITDAR coverage for the trailing 12 months ended December 31, 2016.
>
> In an effort to assist the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7

facilities. This region has struggled of late and given its geographical remoteness, has been difficult to oversee.

We anticipate the sale of all 7 facilities in that region to be completed by the second quarter of 2017, with 3 facilities having already been sold.

48.     Defendant Booth's depiction of Orianna's condition was far from an accurate reflection of the truth, since by the May 4, 2017 Earnings Call, Defendants knew that Orianna's financial situation was already in dire straits.  Not only did the Company begin to execute a plan that included a replacement of Orianna's executive team and an effort to sell facilities, but on May 2, 2017 *it secretly provided Orianna with a "Working Capital Loan," disclosing nothing about that loan to the market*.  This loan was extended through a subsidiary, OHI Asset RO, LLC, providing Orianna an $18.8 million loan for working capital.  In the DIP Financing Motion, Orianna describes the loan agreement as follows:

> Pursuant to the Working Capital Loan Agreement, dated May 2, 2017 (the "Working Capital Loan Agreement" and together with all related agreements, documents, and instruments, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Working Capital Documents" and, together with the Master Lease Documents, the "Prepetition Documents"), OHI Asset RO, LLC, as lender (the "Working Capital Lender" and collectively with the Master Lease Parties, the "Prepetition Secured Parties"), which is an Omega Party, provided an $18.8 million line of credit to the Debtors listed as "Borrowers" on Schedule 2 thereto (the "Working Capital Debtors") for working capital expenses (the "Working Capital Loan"). ***Most of the proceeds of the Working Capital Loan were used by the Debtors to pay rent and real property taxes*** with the remainder used for other Debtor operating expenses. ***As of the Petition Date, the outstanding principal balance under the Working Capital Loan Agreement is approximately $15 million*** (together with all other amounts incurred or accrued prior to the Petition Date, the "Working Capital Obligations").

(Emphasis added).

49.     In other words, while telling the market that Orianna had begun to stabilize and creating the impression that the investment was under control, Omega hid from the market that it had just lent Orianna $18.8 million to pay rent back to Omega.  Upon information and belief, and

as alleged in the Related Securities Action, the Company made this loan to Orianna either from its cash on hand, or by drawing on Omega's own revolving line of credit.  According its public filings, the Company reported $40,349,000 in cash or cash equivalents as of March 31, 2017, and reported an outstanding balance of $123,000,000 on its revolving line of credit.  However, as of June 30, 2017, the Company reported $21,031,000 in cash or cash equivalents, and an outstanding balance of $155,000,000 on the Company's revolving line of credit.  Thus, on May 2, 2017, Omega made a surreptitious loan to one of its largest operators that amounted to 46.6% of its available cash, or 12% of the outstanding balance of its revolving credit facility, but failed to disclose any of this to the public.

50.     Defendants understood the materiality of the above information. For example, in its 2017 10-K Annual Report, filed February 23, 2018, the Company stated the following concerning mere negotiations of providing a working capital loan to Signature, another struggling top-ten operator:

> A second operator, Signature Healthcare ("Signature") has also fallen more than 90 days past due on rent, we believe primarily as a result of restrictions on their borrowing capacity and significant professional and general liability claims. A large majority of Signature's past due rent is covered by a letter of credit in excess of $9.0 million and guarantees from the principals of Signature. Despite their current liquidity concerns, we believe we have a  path to continue our long standing relationship with Signature under a long term consensual restructure outside of a court-involved restructuring that involves multiple third-party constituents (i.e., Sabra Heath Care REIT, Inc., the United States Department of Justice, and other third-party claimants). ***We are working towards finalizing a comprehensive settlement agreement amongst Signature and their three primary landlords which will effectively bifurcate each of the three portfolios into three distinct legal silos and separate virtually all legal obligations. As part of this agreement, Omega has agreed to defer certain rent payment obligations and provide for a working capital loan.*** While we cannot predict the final outcome with these third-party constituents, we are optimistic that an out of court restructure can be realized.

(Emphasis added).

51.     In Signature's case, the Company disclosed it had agreed to provide a working

capital loan in advance of the loan closing and being funded. Conversely, in Orianna's case, the Company made no such disclosure of the $18.8 million working capital loan. By the time Orianna filed for bankruptcy protection in March 2018, Orianna reported the outstanding balance on the Working Capital Loan to be approximately $15 million.

52.    Throughout the Relevant Period, Defendants knew or recklessly disregarded that Orianna was in a grave financial condition, was unable to pay real estate taxes on its facilities, and was unable to make material rent payments to the Company. Defendants knowingly and secretly lent Orianna over $18 million in an attempt to hide from the public the gravity of Orianna's financial woes and the likely impact on the Company's financial results.

### Defendants Cause the Company to File the Materially Incomplete and Misleading Proxy Statement

53.    On April 25, 2017, Defendants Bernfield, Bobins, Callen, Hill, Korman, Lowenthal, Perks, Pickett, and Plavin caused Omega to file with the SEC its Proxy Statement on Form DEF 14A in connection with the 2017 Annual Meeting of Shareholders (the "2017 Proxy"). In the 2017 Proxy, Defendants solicited shareholder votes to, among other things, re-elect themselves to the Board. Defendants issued materially misleading statements with respect to the solicited votes.

54.    Concerning the Board's role in risk oversight, the 2017 Proxy stated the following in support of re-electing the then current directors:

> The Board of Directors, as a whole and at the committee level, plays an important role in overseeing the management of risk. Management is responsible for identifying the significant risks facing the Company, implementing risk management strategies that are appropriate for the Company's business and risk profile, integrating consideration of risk and risk management into the Company's decision-making process and communicating information with respect to material risks to the Board or the appropriate committee.

***Portfolio and investment risk is one of the principal risks faced by the Company.*** We manage portfolio and investment risk by, among other things, seeking Investment Committee and/or Board approval for new investments over designated thresholds and providing detailed underwriting information on such proposed investments to the Investment Committee or the Board, as the case may be. ***In addition, our full Board regularly reviews the performance, credit information and coverage ratios of our operators.***

Consistent with the rules of the NYSE, ***the Audit Committee provides oversight with respect to risk assessment and risk management, the Company's financial statements and internal control over financial reporting.*** The Compensation Committee reviews risks associated with the Company's compensation plans and arrangements. ***While each committee monitors certain risks and the management of such risks, the full Board is regularly informed about such matters.*** The full Board generally oversees risk and risk management issues otherwise arising in the Company's business and operations.

(Emphasis added).

55.     Defendants' statements misleadingly suggested that the Board and the Audit Committee provided adequate oversight to properly identify, assess, and manage risks, and also to control exposure to financial risks.  In addition, the 2017 Proxy omitted any disclosures reflecting the known financial risks associated with the Company's second largest financial investment, Orianna.

56.     The 2017 Proxy harmed Omega and its shareholders by interfering with the proper governance on its behalf that follows the free and informed exercise of the shareholders' right to vote for directors.  As a result of Defendants' misleading statements in the 2017 Proxy, Omega's shareholders voted to re-elect Defendants Bernfield, Bobins, Callen, Hill, Korman, Lowenthal, Perks, Pickett, and Plavin.

### Defendants Cause the Company to Issue Materially Misleading Information and/or Omit Material Information from the Company's Public Statements and Filings

57.     At the beginning of the Relevant Period, on May 3, 2017, the Company issued a press release entitled "Omega Announces First Quarter 2017 Financial Results; Increased

Dividend Rate for 19th Consecutive Quarter." The press release stated, in pertinent part:

### 2017 ADJUSTED FFO GUIDANCE AFFIRMED

The Company affirmed its 2017 annual Adjusted FFO available to common stockholders to be between $3.40 and $3.44 per diluted share. The Company's 2017 FAD guidance and reconciliation to projected net income can be found in the Company's First Quarter 2017 Financial Supplement located on the Company's website. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings.

| | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) Full Year |
|---|---|
| Net Income | $ 1.86 - $1.90 |
| Depreciation | 1.40 |
| Gain on assets sold | (0.04) |
| Real estate impairment | 0.04 |
| FFO | $ 3.26 - $3.30 |
| Adjustments: | |
| Contractual settlement | (0.05) |
| Provision for uncollectible accounts | 0.01 |
| Transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $ 3.40 - $3.44 |

58.    On the next day, May 4, 2017, the Company held a conference call to discuss its first quarter results ("May 4 Earnings Call"). On the call, Defendant Booth stated the following with respect to Orianna:

As of March 31, 2017, Omega had an operating asset portfolio of 972 facilities, with approximately 99,000 operating beds.

These facilities were spread across 77 third-party operators and located within 41 states and the United Kingdom. Trailing 12-month operator EBITDARM and EBITDAR coverage for our portfolio increased slightly during the fourth quarter of 2016 to 1.69x and 1.33x, respectively versus 1.68x and 1.31x, respectively for the trailing 12-month period ended September 30, 2016. The pressures on portfolio performance experienced in 2016, such as increased labor costs and decreased lengths of stay have begun to show some signs of stability in the fourth quarter results, as well as year-to-date results in the first quarter.

*One private top 10 operator, of note, however, felt the performance pressure more than most. This was exacerbated in 2016 by complete replacement of senior management early in the year.*

*The new management team well known and respected by Omega worked throughout 2016 to transform the culture of the company, which included changing out many facility-level management teams. During this transition period, the company's operational performance suffered such that the portfolio dipped below 1x EBITDAR coverage for the trailing 12 months ended December 31, 2016.*

In an effort to assist the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities. This region has struggled of late and given its geographical remoteness, has been difficult to oversee.

We anticipate the sale of all 7 facilities in that region to be completed by the second quarter of 2017, with 3 facilities having already been sold.

59.    Later in the call, Defendant Pickett stated the following concerning Omega's

guidance for 2017:

**Nicholas Yulico** - UBS Investment Bank, Research Division - Executive Director and Equity Research Analyst- REIT's: Okay. And so going back to this tenant who is not current on rent, sounds like they missed a rent payment in the first quarter. I'm confused as to why then your guidance for the year doesn't get reflected? Why wasn't the guidance reduced if you have a tenant that's not paying rent? And still hasn't paid rent?

**Pickett:** Well, it's -- well, they're 45 days past due, so it's a month and a half. We spent an enormous amount of time understanding the plan, and we look at Q1 with 1.09 coverage. Once the Northwest sale is executed, which we're halfway through, and we look at their plan going out throughout the rest of the year, and it's pretty clear if they hit their plan that we're going to be back to current. *But frankly, at 45 days past due, to start fiddling around with guidance, just doesn't make any sense, we feel pretty comfortable that they're going to come back with coverages at their previous level, which is* (inaudible).

(Emphasis added)

60.    On May 5, 2017, the Company filed the May 5 10-Q. The May 5 10-Q reaffirmed

the Company's statements about its financial results contained in the press release issued on May

3, 2017. In addition, the 10-Q contained the following Note concerning the Company's direct

financing leases, including the leases it held with Orianna:

> On November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease.

> The lease agreements allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term. In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million investment plus the net present value of the remaining payments under the lease and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time.

> The 56 facilities represent 5,623 licensed beds located in 12 states, predominantly in the southeastern U.S. The 56 facilities are separated by region and divided amongst four cross-defaulted master leases. The four regions include the Southeast (39 facilities), the Northwest (7 facilities), Texas (9 facilities) and Indiana (1 facility).

> Additionally, we own four facilities and lease them to New Ark under a master lease which expires in 2026. The four facility lease is being accounted for as an operating lease.

> ***In March 2017, we executed sale agreements with two unrelated third parties to sell the 7 Northwest facilities with a carrying value of approximately $36.4 million for $34.0 million. As a result, we recorded an allowance for loss of approximately $2.4 million. For the three months ended March 31, 2017, we recognized approximately $0.8 million of direct financing lease income on a cash basis related to the Northwest facilities lease. The sale of these facilities is expected to close in the second quarter of 2017.***

(Emphasis added).

     61.     Also in the May 5 10-Q, the Company also described its evaluation process for

determining the impairment of an asset, in relevant part, as follows:

> Management evaluates our real estate investments for impairment indicators at each reporting period, including the evaluation of our assets' useful lives. The judgment regarding the existence of impairment indicators is based on factors such as, but not

limited to, market conditions, operator performance, legal structure, as well as our intent with respect to holding or disposing of the asset. If indicators of impairment are present, management evaluates the carrying value of the related real estate investments in relation to the future undiscounted cash flows of the underlying facilities. Provisions for impairment losses related to long-lived assets are recognized when expected future undiscounted cash flows based on our intended use of the property are determined to be less than the carrying values of the assets. An adjustment is made to the net carrying value of the real estate investments for the excess of carrying value over fair value. The fair value of the real estate investment is determined by market research, which includes valuing the property as a nursing home as well as other alternative uses. All impairments are taken as a period cost at that time, and depreciation is adjusted going forward to reflect the new value assigned to the asset. Management's impairment evaluation process, and when applicable, impairment calculations involve estimation of the future cash flows from management's intended use of the property. Changes in the facts and circumstances that drive management's assumptions may result in an impairment of the Company's assets in a future period that could be material to the Company's results of operations.

62.     Defendants omitted from the May 5 10-Q, however, that the Company had engaged in this evaluation process with respect to the Orianna leases, nor does it indicate that as of the date of the 10-Q there existed any possibility of financial impairment.

63.     The May 5 10-Q also contains, in the notes to the financial statements, an entry titled "Note 18 – Subsequent Events," which states as follows:

On April 4, 2017, we issued (i) $550 million aggregate principal amount of our 4.75% Senior Notes due 2028 (the "2028 Notes") and (ii) an additional $150 million aggregate principal amount of our existing 4.50% Senior Notes due 2025 (the "2025 Notes", and together with the 2028 Notes collectively, the "Notes"). The 2028 Notes mature on January 15, 2028 and the 2025 Notes mature on January 15, 2025.

The 2028 Notes were sold at an issue price of 98.978% of their face value before the underwriters' discount and the 2025 Notes were sold at an issue price of 99.540% of their face value before the underwriters' discount. Our net proceeds from the Notes offering, after deducting underwriting discounts and expenses, were approximately $690.7 million. The net proceeds from the Notes offering were used to (i) redeem all of our outstanding $400 million aggregate principal amount of 5.875% Senior Notes due 2024 (the "2024 Notes") on April 28, 2017, (ii) prepay the $200 million Tranche A-2 Term Loan Facility on April 5, 2017 that otherwise would have become due on June 27, 2017, and (iii) repay outstanding borrowings under our revolving credit facility. As a result of the redemption of the 2024 Notes, during the second quarter of 2017, the Company will record approximately $16.5

million in redemption related costs and write-offs, including $11.8 million for the call premium and $4.7 million in net write-offs associated with unamortized deferred financing costs.

64.    The May 5 10-Q also states, under Item 1A – Risk Factors, that "[t]here have been no material changes to our risk factors as previously disclosed in Item 1A contained in Part I of our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and filed with the Securities and Exchange Commission ("SEC") on February 24, 2017."

65.    In its 2016 10-K, Omega disclosed the following risk factors, in relevant part:

Our financial position could be weakened and our ability to make distributions and fulfill our obligations with respect to our indebtedness could be limited if our operators, or a portion thereof, become unable to meet their obligations to us or fail to renew or extend their relationship with us as their lease terms expire or their mortgages mature, or if we become unable to lease or re-lease our facilities or make mortgage loans on economically favorable terms. We have no operational control over our operators. Adverse developments concerning our operators could arise due to a number of factors, including those listed below.

***The bankruptcy or insolvency of our operators could limit or delay our ability to recover on our investments.***

We are exposed to the risk that a distressed or insolvent operator may not be able to meet its lease, loan, mortgage or other obligations to us or other third parties. This risk is heightened during a period of economic or political instability. Although each of our lease and loan agreements typically provides us with the right to terminate, evict an operator, foreclose on our collateral, demand immediate payment and exercise other remedies upon the bankruptcy or insolvency of an operator, title 11 of the United States Code (the "Bankruptcy Code") would limit or, at a minimum, delay our ability to collect unpaid pre-bankruptcy rents and mortgage payments and to pursue other remedies against a bankrupt operator. While we sometimes have third party guarantees of an operator's lease or loan obligations, such guarantees can be expensive to enforce, and have their own risks of collection as against the guarantors.

*        *        *

***We may be unable to find a replacement operator for one or more of our leased properties.***

From time to time, we may need to find a replacement operator for one or more of our leased properties for a variety of reasons, including upon the expiration of the

lease term or the occurrence of an operator default. During any period in which we are attempting to locate one or more replacement operators, there could be a decrease or cessation of rental payments on the applicable property or properties. We cannot assure you that any of our current or future operators will elect to renew their respective leases with us upon expiration of the terms thereof. Similarly, we cannot assure you that we will be able to locate a suitable replacement operator or, if we are successful in locating a replacement operator, that the rental payments from the new operator would not be significantly less than the existing rental payments. Our ability to locate a suitable replacement operator may be significantly delayed or limited by various state licensing, receivership, certificate of need or other laws, as well as by Medicare and Medicaid change-of-ownership rules. We also may incur substantial additional expenses in connection with any such licensing, receivership or change-of- ownership proceedings. Any such delays, limitations and expenses could materially delay or impact our ability to collect rent, obtain possession of leased properties or otherwise exercise remedies for default.

66.    In anticipation of Defendants' July 27, 2017 conference call to discuss second quarter results, in a July 26, 2017 report, UBS analyst Nick Yulico focused on the Orianna issue. In a report sub-titled "Top 10 Tenant Still Behind on Rent,", Yulico wrote that among the issues that he expected Defendants to address were "top operators New Ark [(Orianna)] and Signature, among others." Yulico wrote further:

**Q: What do 2Q results mean for the stock?**

Tenant operating metrics looked similar for 2Q vs. 1Q; however, one top tenant (New Ark, 6.4% of rent) remains under 1x EBITDAR coverage and late on rent (beyond 30 days). We look to hear more about what payments (if any) were recouped from New Ark after 1Q shortfall. A smaller portion of rent (0.2), an add'l SNF w/ coverage below 1x, is also now behind in rent. OHI removed its cash flow statement from the supplemental; this comes after 1Q when operating cash flow growth underperformed EBITDA and FFO/FAD because of missed rent payments. We note ytd accounts receivable growth (+30% y/y) is meaningfully outpacing revenue growth ytd (6% y/y), which may signal increased mismatch on rent collections. We continue to think the skilled nursing industry is facing meaningful headwinds from bundling programs, CJR, and shifts to Medicare Advantage. OHI has the highest SNF exposure (~90% of NOI) in our coverage.

67.    Also on July 26, 2017, BTIG analyst Michael Gorman wrote a report, titled "Omega Healthcare Investors Reports Adjusted FFO of $0.84, But Tenant Health Remains the Focus; Maintain Neutral." In his report, Gorman wrote:

Omega reported 2Q17 FFO/sh of $0.84 after adjusting for one-time refinancing expenses during the quarter. The result compares to our estimate of $0.85 and the consensus of $0.83. Management narrowed its 2017 adjusted FFO guide to $3.42-$3.44 from $3.40- $3.44 previously. However, tenant health within the portfolio remains an issue as tenants representing more than 10% of revenue have an EBITDAR coverage below 1.0x, and tenants representing 6.6% of revenue are more than 30-days delinquent on rent. We maintain our Neutral rating.

- Omega's adjusted FFO of $0.84 missed our estimate by $0.01. Relative to our model NOI, mortgage interest income, and provisions for uncollectible accounts all drove the lower result.

- Management adjusted its 2017 FFO/sh guidance range to $3.42-$3.44, raising the midpoint $0.01 from the prior range. The new $3.43 midpoint compares to our estimate of $3.41 and the consensus of $3.39. However, we would note that management's guidance includes certain add-backs that we exclude from our estimates.

- Tenant health remains an issue for the portfolio. While EBITDARM coverage levels were flat sequentially at 1.69x, they were down from 1.75x in the prior-year period. Moreover, 11 tenants representing 10.3% of revenue carry an EBITDAR coverage ratio of less than 1.0x. While this is roughly in line with the 10.4% from 1Q17, we would note that two of those tenants, representing 6.6% of rents, are now more than 30-days late on their rental payments. We believe this highlights potential material risks to the near- term income stream.

68.     Thus, analysts following Omega recognized that the financial condition of its tenants, and particularly Orianna, was critical to Omega's FFO.

69.     The above statements were false and misleading. Defendants knew or recklessly disregarded, but failed to disclose, that Orianna's situation was materially more adverse than they let on, as  Defendants knew or recklessly disregarded that:  (i) Orianna was delinquent in their rent payments to Omega, and further, that they were delinquent with rent and real estate tax payments to such an extent that Omega was compelled to lend Orianna $18.8 million to make tax and rent payments, and (ii) that if the Company was forced to find a new operator for the Orianna facilities, that they would face a loss on those facilities, in that transitioning such facilities to a new operator involves significant costs in terms of obtaining regulatory approval and potential interruption of

services, as well as the risk that a new operator would be able to extract more favorable lease terms from Omega.

70.     Defendants should have disclosed the above information to the public, and their failure to do so resulted in financial harm to the Company.

## The Company Issues Partial Disclosures, ## While Still Concealing the True Extent of the Problem

71.     On July 26, 2017, after the market closed, the Company issued a press release entitled "Omega Announces Second Quarter 2017 Financial Results; Increased Dividend Rate for 20th Consecutive Quarter." The press release stated, in pertinent part:

> ***Funds From Operations*** – For the three-month period ended June 30, 2017, FFO was $150.9 million, or $0.73 per common share on 207 million weighted-average common shares outstanding, compared to $172.3 million, or $0.87 per common share on 199 million weighted-average common shares outstanding, for the same period in 2016.
>
> The $150.9 million of FFO for the three-month period ended June 30, 2017 includes the impact of $23.5 million of one-time interest refinancing costs, $3.7 million of non-cash stock-based compensation expense and $2.7 million in provision for uncollectible accounts, offset by $1.9 million of one-time revenue.
>
> The $172.3 million of FFO for the three-month period ended June 30, 2016 includes the impact of a $5.4 million cash receipt related to early termination of mortgages, $3.7 million of non-cash stock- based compensation expense, $3.5 million of acquisition costs and a $1.2 million adjustment (recovery) related to the provision for uncollectible accounts.
>
> Adjusted FFO was $179.0 million, or $0.87 per common share, for the three months ended June 30, 2017, compared to $173.0 million, or $0.87 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

72.     In their July 26th Press Release, the Company revised its 2017 guidance on FFO *upwards* as follows:

## 2017 ADJUSTED FFO GUIDANCE REVISED

The Company has revised its 2017 annual Adjusted FFO available to common

stockholders to be between $3.42 and $3.44 per diluted share. The Company's 2017 FAD guidance and reconciliation to projected net income can be found in the Company's Second Quarter 2017 Financial Supplement located on the Company's website. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings.

| | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) |
| --- | --- |
| | Full Year |
| Net Income | $ 1.82 - $1.84 |
| Depreciation | 1.40 |
| Gain on assets sold | (0.03) |
| Real estate impairment | 0.09 |
| FFO | $ 3.28 - $3.30 |
| Adjustments: | |
| Contractual settlement | (0.05) |
| Provision for uncollectible accounts | 0.02 |
| Transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| One-time revenue | (0.01) |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $ 3.42 - $3.44 |

73.     On July 27, 2017, the Company held a conference call to discuss its second quarter,

2017 results. On the call, Booth stated, in relevant part:

> While we're cautiously optimistic that portfolio-wide coverages have stabilized, we continue to see certain regional operators struggle with various operational pressures, including a tightened labor market, length of stay compression and an increase in PL/GL claims. Two our top ten private operators in particular have seen margins and coverages decline and as a result created liquidity concerns.

> The first of these private operators, and one which we discussed on our last earnings call, has continued to experience [quarterly pressures], despite finally showing signs of operational improvements. Coverage for the trailing 12-months ended March 31, 2017 remained slightly below 1 times. However, results for the standalone first quarter was 1.12 times and year-to-date results through May remained consistent.

> Efforts to manage through these operational pressures have included the following initiatives: replacing the entire executive management team, including a very recent and significant downsizing of both corporate and regional staff; establishing a new disciplined corporate culture which involve replacing a majority of facility-level management; rebranding its corporate identity; revising its mission statement; and implementing new business practices; negotiating numerous vendor contracts; and

lastly, establishing a centralized reform network. Additionally, Omega has helped concentrate this operator's geographic footprint by selling off six of its seven Northwest facilities to third-party operators. One remaining facility in the Northwest is expected to be sold on August 1, pending regulatory approval. Omega has also transitioned this operator's entire Texas region which consisted of nine facilities to another existing Omega tenant.

We are consciously optimistic that the combination of these efforts will result in steadily improving margins and eventually return to its former profitability. However, in the meantime, our past due rent has reached nearly ninety days in arrears. As such, any further deterioration and/or the failure of the tenant to achieve its budgeted plan may result in cash basis accounting and a potential review of the value of these capital lease assets.

74.     In response to this partial disclosure, the Company's stock price fell $1.35 per share, or 4%, to close at $32.10 per share on July 27, 2017, on unusually heavy volume of 6.33 million shares traded.

75.     On August 9, 2017, the Company filed its 10-Q for the quarter ending June 30, 2017. The 10-Q reaffirmed the Company's statements about its financial results contained in the July 26th press release, and also contained the following statements concerning the struggles faced by two of its top operators, Orianna and Signature, respectively:

At June 30, 2017, two of our top 10 operators were approximately 90 days past due on rent payments to the Company. One of these operators has been facing liquidity pressures following a management transition, but has been showing signs of operational improvement and is currently making partial monthly rent payments. The current management of this operator is pursuing operational improvements, such as replacing executive management and senior level management, renegotiating vendor contracts and establishing a centralized referral network. The Company is working with this operator to concentrate its geographic footprint by selling certain facilities, of which five were sold prior to June 30, 2017. The Company expects to sell two other facilities and transition its existing Texas portfolio to another operator during the third quarter of 2017. The Company is optimistic that the combination of these efforts will result in improving margins and performance by this operator. The Company is currently recording rental revenue from this operator on an accrual basis. The Company continues to monitor the operator's operating plan and in the event its performance deteriorates, the Company will reassess the carrying value of the portfolio and consider recording future rental revenue on a cash basis.

The other operator with approximately 90 days rent past due has been adversely affected by an adverse general and professional liability environment in Kentucky and is in ongoing discussions to settle matters arising from a U.S. Department of Justice investigation. The Company has negotiated a proposed restructuring plan with this operator, subject to the operator's resolution of its obligations with other landlords and lenders and the Department of Justice investigation. Receivables from this operator are backed by a security deposit and guarantees from the principals of the operator.

The Company believes the current performance of these two operators primarily reflects specific operator-related or localized issues rather than issues generally impacting the industry. The Company continues to closely monitor the performance of these two operators specifically, as well as industry trends and developments generally.

76.     The above statements were false and misleading. Defendants knew or recklessly disregarded, but failed to disclose, that Orianna's situation was materially more adverse than they let on, as Defendants knew or recklessly disregarded that:  (i) Orianna was delinquent in their rent payments to Omega, and further, that they were delinquent with rent and real estate tax payments to such an extent that Omega was compelled to lend Orianna $18.8 million to make tax and rent payments, and (ii) that if the Company was forced to find a new operator for the Orianna facilities, that they would face a loss on those facilities, in that transitioning such facilities to a new operator involves significant costs in terms of obtaining regulatory approval and potential interruption of services, as well as the risk that a new operator would be able to extract more favorable lease terms from Omega.

77.     In response to Defendants' late July disclosures, analysts continued to focus on "tenant health," even in the context of a positive second quarter. Analysts were unaware that the only way Omega "beat their 2Q17 AFFO/sh guidance" was by means of the Working Capital Loan to Orianna. For example, in an August 3, 2017, Jeffries analyst Omotayo Okusanya wrote:

**Key Takeaway**

**Although OHI beat their 2Q17 AFFO/sh guidance and revised their FY AFFO/sh outlook to $3.42-$3.44 from $3.40-$3.44, investors were more concerned with the health of two top ten tenants (Signature Healthcare and Ark) who continue to not be current on their rents. We are increasingly relying on scenario analysis (see below) to assess tenant credit risk and lowering our PT to $32 to reflect our updated base case scenario.**

**Our Base Case ($32 PT, 2017/2018 AFFO/sh $3.37/$3.31, 2017/2018 FAD $3.01/ $2.93):** Our base case scenario has OHI not recouping the $20M of outstanding rents from Ark & Signature. In addition, this scenario includes our view that OHI recognizes just cash rents received going forward given the challenges that these two tenants face. Rent received was $35M in 1H17, which we model as $17.5M per quarter going forward.

**Our Downside Case ($27 PT, 2017/2018 AFFO/sh $3.37/$3.30, 2017/2018 FAD: $3.01/$2.92):** Under this case, both Signature and Ark's financial health deteriorates, causing them both to go bankrupt. We also assume a third tenant (Consulate Healthcare) defaults under this scenario given the recent $347M fraud judgment against it. In the event that this occurs, we see low risk of leases being rejected given current rent coverage (~0.96x at Ark and ~1.3x at Signature). We believe OHI would be able to either renegotiate their leases with Signature & Ark or find new tenants to operate the facilities, where they would be paying rents similar if not more than what Signature & Ark were currently paying. The downside risk comes from bankruptcies driving heightened tenant credit risk, which would cause valuation multiple compression. Our $27 valuation under this scenario implies a compressed 8.0x P/AFFO multiple, which is warranted as we note SNF focused Healthcare REITs hit historical lows of 4-5x P/AFFO in the late-1990's when several SNF operators were going bankrupt due to a major change in reimbursement policy. Should all three tenants enter bankruptcy, we expect dividend growth would be suspended and the quarterly dividend held at its current rate of $0.64.

(Emphasis in original).

78.    Notwithstanding that Orianna only paid second quarter rent by means of Omega's cash infusion, Defendants' omission of that fact convinced the market that Orianna continued to pay rent. As Jeffries analyst Okusanya stated in an August 3, 2017 report, "Signature & Ark (two top ten tenants) continue to partially pay rents resulting in OHI moving to cash basis to recognize revenues."

## The Truth Is Revealed

79.     The truth concerning the full extent of Orianna's issues was revealed on October 30, 2017 when the Company issued a press entitled "Omega Announces Third Quarter 2017 Financial Results; Increased Dividend Rate for 21st Consecutive Quarter." Therein, the Company stated, in relevant part:

### CEO COMMENTS

Taylor Pickett, Omega's Chief Executive Officer stated, "We are in active discussions with Orianna regarding the transition of some or all of their remaining portfolio to new operators. Since 2014, occupancy in the Orianna portfolio has declined from 92% to 89%. Revenue has grown by 2%, while operating expenses have grown by 6%. We believe that for some of the Orianna facilities new operators may be able to improve occupancy and reduce expenses; however, based on current facility performance, we anticipate that the current annual contractual rent of $46 million will likely be reduced to a range of $32 million to $38 million once the transition process is complete." Mr. Pickett, continued, "The transition timing is expected to take approximately six months."

$$*  \qquad *  \qquad *$$

### THIRD QUARTER 2017 RESULTS

*Operating Revenues and Expenses* – Operating revenues for the three-month period ended September 30, 2017 totaled $219.6 million which included $13.3 million of non-cash revenue. Operating expenses for the three-month period ended September 30, 2017 totaled $307.9 million and consisted of $194.7 million in impairment on direct financing leases related to the Orianna portfolio, $11.9 million in provision for uncollectible accounts ($9.5 million related to Orianna), 71.9 million of depreciation and amortization expense, $17.8 million of impairment on real estate properties, $7.7 million of general and administrative expense, and $3.9 million of stock-based compensation expense.

*Other Income and Expense* – Other income and expense for the three-month period ended September 30, 2017 was a net expense of
$49.5 million, primarily consisting of $47.4 million of interest expense and $2.2 million of amortized deferred financing costs.

*Funds From Operations* – For the three-month period ended September 30, 2017, FFO was a loss of ($46.8) million, or a loss of ($0.24) per common share on 207 million weighted-average common shares outstanding, compared to $162.6 million, or $0.80 per common share on 204 million weighted-average common

shares outstanding, for the same period in 2016.

The $46.8 million loss of FFO for the three-month period ended September 30, 2017 includes the impact of $194.7 million in impairment on direct financing leases, $11.9 million in provision for uncollectible accounts and $3.9 million of non-cash stock-based compensation expense.

The $162.6 million of FFO for the three-month period ended September 30, 2016 includes the impact of $3.7 million of non-cash stock-based compensation expense, $2.3 million of acquisition and merger related costs, $1.8 million of interest refinancing costs and $0.5 million of noncash revenue.

Adjusted FFO was $163.6 million, or $0.79 per common share, for the three-month period ended September 30, 2017, compared to $169.9 million, or $0.83 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

## CFO COMMENTS

Bob Stephenson, Omega's Chief Financial Officer commented, "During our second quarter earnings call, we stated we were closely monitoring one of our operators and may have to place them on a cash basis for revenue recognition if their performance did not improve. Since Orianna did not achieve their revised operating plan and pay their full contractual rent, we placed them on a cash basis and therefore our third quarter results, including AFFO and FAD, do not include any revenue related to Orianna." Mr. Stephenson continued, "Since 93% of our Orianna portfolio was classified as a direct financing lease, placing them on a cash basis and initiating the process to transition some or all of their portfolio to new operators also required us to record several large provisions related to the direct financing leases during the quarter."

\*       \*       \*

## 2017 ADJUSTED FFO GUIDANCE REVISED

Bob Stephenson, Omega's CFO commented, "We are lowering our 2017 guidance to reflect the temporary loss of third and fourth quarter 2017 revenue primarily related to placing Orianna and a non- top ten operator on a cash basis."

The Company's revised guidance for 2017 Adjusted FFO is now $3.27 to $3.28 per diluted share. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings.

| | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) |
| --- | --- |
| | Full Year |
| Net Income | $ 0.62 - $0.63 |
| Depreciation | 1.37 |
| Gain on assets sold | (0.04) |
| Real estate impairment | 0.17 |
| FFO | $ 2.12 - $2.13 |
| Adjustments: | |
| Provision for impairment on direct financing leases | 0.96 |
| Provision for uncollectible accounts | 0.07 |
| Contractual settlement | (0.05) |
| Acquisition/transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| Other revenue | (0.01) |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $ 3.27 - $3.28 |

80.     The next day, on October 31, 2017, the Company held a conference call with analysts and investors to discuss its third quarter results. On the call, Defendants Pickett, Stephenson, and Booth stated, in relevant part:

**Pickett**

Adjusted FFO for the third quarter is $0.79 per share. Funds available for distribution, FAD, for the quarter is $0.73 per share. ***The reduction in adjusted FFO and FAD is primarily related to converting the Orianna portfolio to cash basis accounting with no adjusted FFO or FAD recognized for Orianna in the third quarter***.

\*          \*          \*

**Stephenson**

Operating revenue for the quarter was approximately $220 million versus $225 million for the third quarter of 2016. The decrease was primarily a result of placing Orianna on a cash basis, and therefore, we recorded no Orianna revenue for the quarter.

\*          \*          \*

We have lowered our 2017 adjusted FFO guidance to $3.27 to $3.28 per share. The reduction is primarily a result of two items: first, it reflects the temporary loss of Orianna revenue for both the third and fourth quarters; and second, we placed a non-top ten operator on a cash basis effective September 1st, as our outstanding

contractual receivable exceeded our revenue recognition test.

*     *     *

**Booth**

In addition to Orianna, we continue to experience specific operator performance issues as discussed on our last several calls, including Signature Healthcare, another top 10 operator. In both cases, liquidity issues are impacting the ability of these operators to pay rent on a timely basis.

The first operator, Orianna, has fallen significantly behind on rent and as a result has been placed on a cash basis accounting as previously discussed by both Taylor and Bob. While we have endeavored to assist Orianna in streamlining operations by transitioning both their Northwest and Texas regions, the overall portfolio continues to struggle in past due rent headwind.

Our next step, hopefully, is to consensually transition of the remaining portfolio of 42 facilities by virtue of either asset sales or re-leasing to other operators. While we believe the remaining states are considered very attractive within our industry. We expect our contractual rent to decline by a range of between 8 million and 14 million per annum. This will result in a pro forma EBITDAR coverage ratio, assuming all the facilities are released of between 1.2 times and 1.5 times given current performance.

Our second top 10 operator, Signature Healthcare, has also fallen further behind on rent in the third quarter, predominantly as a result of anticipated tightening restrictions upon their borrowing base by their working capital lender thus reducing availability. At this time, it is important to note that the vast majority of Signature's past due rent balance is covered by a letter of credit in excess of $9 million.

Despite the current liquidity situation, we believe we have a path to continue our longstanding relationship with Signature, under a long- term consensual restructure that involves multiple constituents  and then keep Signature out of a formal court-involved reorganization. This out of court restructuring may involve the following components of consideration: a certain amount of deferred rent, CapEx funds and working capital line of credit. This scenario would involve the approval of other third-party constituents, including Signature's other significant landlord; Signature's working capital lender, the Department of Justice and certain other third-party claimants. While we cannot predict the ultimate outcome of these third-party constituent discussions, we feel that we have made significant progress and are optimistic that an out of court resolution can be realized.

In addition to the Orianna and Signature ongoing restructure efforts, we have on other non-top 10 operator that has fallen behind on rent and that has required future rent payments to be placed on cash basis accounting. Over the last several months,

we have negotiated a settlement and forbearance agreement with this operator, which will result in rent payments in the fourth quarter to be about approximately 23% less than our current contractual rent. Beginning in January, we expect rent to return to the full contractual amount and the past-due rents will begin to be repaid in the latter half of 2018.

(Emphasis added).

81.     On this news, the Company's stock price fell $2.11 per share, or 6.8%, from an October 30, 2017 close of $$30.97 to an October 31, 2017 close of $28.86 per share on relatively enormous volume of 16.2 million shares traded.

82.     On November 7, 2017, the Company filed its quarterly report on Form 10-Q for the quarter ending September 30, 2017. In the 3Q 10-Q, Defendants elaborated on the Company's statements about its financial results contained in the press release and earnings call. The 3Q 10-Q contained the following discussion of the impairment of its direct financing leases with Orianna:

In July 2017, we transitioned nine SNFs, representing all of the facilities subject to another direct financing lease with Orianna in the Texas region, to an existing operator of the Company pursuant to an operating lease. In connection with this transaction, we recorded the real estate properties at our original cost basis of approximately $19.0 million, eliminated our investment in the direct financing lease and recorded an impairment of approximately $1.8 million. In conjunction with this transaction, we also amended our Orianna Southeast region master lease in July 2017 to reduce the outstanding balance by $19.3 million. As a result of the amendment, we recorded an impairment of approximately $20.8 million in the third quarter of 2017.

Orianna has not satisfied the contractual payments due under the terms of the remaining two direct financing leases or the separate operating lease with the Company and the collectability of future amounts due is uncertain. The Company is in preliminary discussions with Orianna regarding future actions. Such actions may include a) the sale of some or all of the facilities, b) transitioning some or all of the facilities from Orianna to other operators and c) pursuing legal action to enforce the terms of the existing agreements.

During the third quarter of 2017, the Company recorded an allowance for loss of $171.9 million with Orianna covering 38 facilities in the Southeast region of the U.S. The amount of the allowance was determined based on the fair value of the facilities subject to the direct financing lease. To estimate the fair value of the underlying collateral, the Company utilized an income approach and Level 3 inputs.

The Company considered current and projected operating performance of the facilities, projected rent, prevailing capitalization rates and coverages and bed values. Such assumptions are subject to change based on changes in market conditions and the ultimate resolution of this matter. Such changes could be significantly different than the currently estimated fair value and such differences could have a material impact on the Company's financial statements.

The 39 facilities under our direct financing master leases with Orianna as of September 30, 2017 are located in seven states, predominantly in the southeastern U.S. (38 facilities) and Indiana (1 facility). Our recorded investment in these direct financing leases, net of the $171.9 million allowance, amounted to $337.7 million, as of September 30, 2017. For the three months ended September 30, 2017, we did not recognize any direct financing lease income from Orianna. We recognized total impairments on direct financing leases for the three and nine months ended September 30, 2017 of $194.7 million and $198.0 million, respectively.

83.     Analysts rightly focused their analysis on the Orianna issue. For example, on October 30, 2017, Jeffries analyst Omotayo Okusanya wrote a report titled "Omega Healthcare Investors (OHI) 3Q17 Big Miss, Guidance Lowered." In that report, Okusanya stated, in pertinent part:

**Bottom Line:** It was a challenging quarter for OHI given one of its struggling tenants, Orianna (Ark), did not achieve their revised operating plan and pay its full contractual rent. This caused OHI to place the tenant on cash basis accounting and not recognize any revenue from the tenant in the quarter. The disparity between reported AFFO/sh and our estimates is attributable to the nearly $12M a quarter in rents the company is not recording from Orianna (we had estimated closer to a $10M hit for the entire tenant watch list), as well as higher than expected interest expense ($0.01) and lower interest income ($0.01). OHI has initiated the process to transition some or the entire Orianna portfolio to new operators (see below for further details). After previously raising FY2017 AFFO/sh guidance last quarter to $3.42- $3.44, OHI rolled back its estimates and lowered FY2017 guidance to $3.27-$3.28 in 3Q17. While the tenant issues in the OHI portfolio were made evident to investors in 2Q17, the magnitude of the impairment from Orianna, the lowered full year guidance, and continued concerns about tenant credit risk will likely weigh heavily on the stock tomorrow.

**Orianna Creates Ugly 3Q17 Results:** Given the challenges at Orianna, OHI took a $198M impairment against their $618M investment. As part of the ongoing process of transitioning the portfolio to a new operator, OHI expects annual rents to be reduced from $46M to a range of $32M-$38M, with a six month transition period. This suggests at least a $30M impact ~($0.15 AFFO/sh) to 2018 AFFO/sh. To date, OHI has already transitioned 9 Texas facilities to an existing operator in

the OHI portfolio. Lastly, management notes that OHI recorded an $11.9M provision for uncollectible accounts during 3Q17 mainly in relation to Orianna.

84.    Had the Company not provided the working capital loan to Orianna in May 2017, Orianna would not have been able to pay its quarterly rent.  The undisclosed loan, therefore, enabled Omega to hide from the market market to the above described $12 million gap it is FFO guidance.

85.    On October 31, 2017, Hilliard Lyons analyst John Roberts, in response to Defendants' above disclosures, wrote in pertinent part:

> On the company's conference call, management obviously spent most of its time discussing concerns around the issues with tenants. Three tenants are currently having issues, with one (Orianna) being of immediate issue, as they are currently not paying rent, one other likely subject to a restructuring (Signature) and a third being a near term issue that management anticipates being cured by the beginning of next year. Management anticipates replacing Orianna with a new tenant(s) over the coming six months with an eventual loss of rental income of around $10 million (about 1% of gross rent). In the meantime, no rent will be received on the properties, although Orianna essentially continues to be running the properties. The company has fully reserved for these non-paid rents. We have worked these expectations into our earnings model and adjusted our estimates accordingly. Management had hoped to work with Orianna to restructure this lease, but came to the conclusion that this was the best course of action for these properties. Management noted that they expect a coverage ratio range of 1.2-1.5 times on the new rental rates once the new leases are in place. This compares with the current ratio of under 1.0 times.
>
> As far as Signature goes, they are about a month behind in rent, although they continue to pay a portion of the contractual rent due ($11 million of the $14.5 million contractual amount). OHI has a letter of credit on this lease that covers all of the past due rent. We anticipate a restructuring of this lease, with OHI forgiving some near term rent but receiving higher rental bumps or some other similar advantages. We have worked this assumption into our model as well. As far as the other tenant goes, we are not assuming any loss here beyond the current year (adjusted) due to this being a liquidity issue, rather than an operating issue. While OHI placed the lease on a cash basis, they expect the coverage ratio on the lease to approach a very solid 1.5 times by the start of 2018, which should allow for the tenant to begin paying the contractual rent at that point. There may be some near term reduction of cash flow paid to the company in Q4, however. We anticipate that this amount will be made up to OHI at a later date.
>
> In discussing the issues regarding Orianna, we questioned management on whether

34

the issues that led to the tenant's nonpayment of rent were specific to that tenant or an industry-wide concern. While there are two other tenants currently having issues, all three of these instances are believed to be tenant-specific events, in a challenging industry environment. Management pointed to the occupancy decline between 2014 and the present from 92% to 89% in the Orianna portfolio as a major catalyst behind Orianna's issues. Orianna generated 2% revenue growth over this period while expenses increased at a 6% pace. OHI management does not believe it is appropriate at this time to adjust their underwriting requirements and believes 1.4x coverage remains conservative. Management also feels that their strength is in investing in regional portfolios and partnering with regional operators, while Orianna had a wide geographic dispersion of properties. Moving forward, they expect to stick with separating portfolios by region amongst their operators in an attempt to avoid situations like this in the future. On the cap rate front, management expects to make acquisitions in the 9% to 9.5% range, which will help to offset lost rent from dispositions.

On the operator front, the overall portfolio improved, although that is more a function of the Orianna portfolio moving out of the group due to the lease going to cash accrual. Portfolio coverage in the most recent trailing twelve months was 1.71 times on a gross cash flow basis compared to the previous number of 1.69 times. That number would be around 1.68 were the Orianna portfolio included, so there was a very slight deterioration. We believe that most of the deterioration was a function of labor costs. Management noted that operating costs were up 6% for Orianna, and that most of these costs are likely labor. We would expect other operators to see pressure on this front as well, although higher coverage ratios should allow them to better absorb these costs.

86.     As a result of Defendants wrongful conduct in concealing material, adverse information from the investing public, Defendants have breached their fiduciary duties to the Company.  The Company has failed to recover from the misrepresentations made by Defendants.

## DAMAGES TO THE COMPANY

87.     Omega has been, and will continue to be, severely damaged and injured by the Director Defendants' misconduct.  As a direct and proximate result of the defendants' conduct, Omega has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

   a.  costs incurred in compensation and benefits paid to defendants that violated federal securities laws;

b.   substantial loss of market capital;

c.   costs already incurred and to be incurred defending the Related Securities Action; and

d.   any fines or other liability resulting from the Company's violations of federal law.

88.   Omega's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

89.   The wrongdoing complained of herein has irreparably damaged Omega's corporate image and goodwill.  For at least the foreseeable future, Omega will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Omega's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.   Plaintiff brings this action derivatively in the right and for the benefit of Omega to redress injuries suffered, and to be suffered, by Omega as a direct result of violations of federal securities laws by Defendants.  Omega is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

91.   The Board of Omega, at the time this action was commenced, consisted of the following nine individuals: Defendants Callen, Anand, Bernfield, Bobins, Hill, Lowenthal, Perks, Pickett, and Plavin.  Since the Board consists of nine members, Plaintiff must allege that at least five are not independent or disinterested for demand futility purposes.

92.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Omega Board would be futile, and therefore, excused.

93.     By participating in this course of conduct, the Director Defendants are so committed to the decisions in dispute that they cannot reasonably be expected to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Company's Board is futile, and therefore excused.

### Demand is Futile as to Defendant Pickett

94.     Defendant Pickett has been the Company's Chief Executive Officer since 2001, having received $5,983,244 in total compensation in fiscal year 2017.  Defendant Pickett derives significant income from, and his primary source of income is, his employment as CEO and director of Omega, and as such, his reputation is inextricably bound to his role at Omega.  As acknowledged in the Company's most recent Proxy, Defendant Pickett is not independent and therefore cannot independently consider any demand to sue himself for breaching his fiduciary duties to Omega, as that would expose him to liability and threaten his livelihood.

### Demand is Futile as to the Members of the Audit Committee and Other Directors Because They Are so Committed to the Decisions in Dispute that They Cannot Reasonably Be Expected to Impartially Respond to a Demand

95.     Pursuant to the Company's Audit Committee Charter, Defendants Callen, Lowenthal, Perks, and Plavin, as members of the Company's Audit Committee (the "Audit Committee Defendants"), were responsible for the oversight of the accounting, financial reporting processes, and financial statements of Company.

96.     The Board represented to investors in the Company's 2017 Proxy that, "In addition, our full Board regularly reviews the performance, credit information and coverage ratios of our operators," and that the Board's Audit Committee oversaw the reporting of financial information.

These statements, reasonably taken together, indicate that the Board as a whole kept aware of the performance of the Company's major operators such as Orianna, while the Audit Committee oversaw the integrity of the flow of this information to the public.

97.    It was the policy and practice of Omega's Audit Committee to review SEC filings and press releases before their issuance, and the entire Board signed or authorized their signatures, upon the 2017 Proxy Statement.

98.    Based upon the facts set forth herein, there exists a reasonable inference that the entire Board was aware of the general financial condition of Orianna prior to that information was released to investors.

99.    As of December 31, 2016, Omega's second largest operator, operating 59 facilities across the country, and Omega's investment in the Orianna facilities represented nearly 7% of its overall investment portfolio, with a gross investment of over $619 million.

100.    Given the Board's 2017 Proxy representation that it "regularly reviews the performance, credit information and coverage ratios of our operators," there exists a reasonable inference that in executing their duty to oversee the business of the Company, the Board became apprised of the condition of the Company's second largest investment and was aware of the financial problems Orianna faced.

101.    In public statements made as early as 2016, Defendant Booth noted that "One private top 10 operator, of note, however, felt the performance pressure more than most" and that "In an effort to assist the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities. This region has struggled of late and given its geographical remoteness, has been difficult to oversee." These statements were referring to Orianna and would reasonably put the Board of Directors on notice of the

problems that existed such that it is reasonable to believe its members would have made inquiry and become informed of the full extent of Orianna's financial problems.

102.    It is also reasonable to infer that the Board became aware of the $18.8 million "Working Capital Loan" provided to Orianna in an attempt to stabilize Orianna since $18.8 million represented approximately half the cash the Company had on hand at the time of the loan.  There exists a reasonable inference that the Director Defendants were aware of a transaction of this magnitude and importance (a loan using nearly *half* of the Company's available cash to its second largest investment) or themselves directly authorized it, as well as the intended purpose of the transaction – an attempt to prop up the financial stability of the Company's second largest investment, Orianna.

103.    In addition, Defendants Bernfield, Bobins, Callen, Hill, Korman, Lowenthal, Perks, Pickett, and Plavin negligently caused or permitted false and misleading statements and/or omissions of material fact to be released in the 2017 Proxy.  Specifically, in soliciting shareholders' votes to re-elect Defendants Bernfield, Bobins, Callen, Hill, Korman, Lowenthal, Perks, Pickett, and Plavin, the 2017 Proxy misleadingly suggested that the Board and the Audit Committee provided adequate oversight to properly identify, assess, and manage risks, and also to control exposure to financial risks.  In addition, the 2017 Proxy omitted any disclosures reflecting the known financial risks associated with the Company's second largest financial investment, Orianna.

104.    Given the effect that an operator of Orianna's importance has on the Company's financials, there exists a reasonable inference that the Audit Committee Defendants knew of Orianna's financial situation.

105.    The magnitude of the Director Defendants' breaches of fiduciary duty alleged herein confirms their deep commitment to several disputed decisions, including decisions to: (i)

mislead investors concerning the Company's risks and financial exposure due to Orianna's inability to meet its financial obligations; (ii) fail to disclose the $18.8 million Working Capital Loan to Orianna, despite it representing nearly half of the Company's available cash; and (iii) issue the misleading 2017 Proxy Statement to re-elect themselves to the Board.

106.     Because there exists reasonable inferences that a majority of the Board knowingly tolerated the Company's failure to report – and cover-up of – the severe financial problems facing Orianna, the Director Defendants are so committed to the decisions and conduct which would be the subject of the demand, that they cannot impartially consider demand.  As a result, demand is excused.

107.     As alleged above, the Director Defendants breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding Orianna's inability to make its rent payments, thus creating a material risk to the financial health of the Company.

108.     Accordingly, demand upon the Director Defendants in connection with the false and misleading statements detailed above is a futile endeavor, as they cannot possibly consider a demand to sue themselves.

## Additional Reason for Demand Futility

109.     Omega's officers and directors are protected against personal liability for their acts of mismanagement and violations of federal securities law alleged in herein by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Omega.  Upon information and belief, however, there have been certain changes in the language of directors' and officers' liability insurance policies in the past few years and the directors' and officers' liability insurance policies

covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Omega against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Omega, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit.  On the other hand, such insurance coverage exists for this action, which is brought derivatively, and will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director Defendants is futile, and therefore, excused.

## COUNT I

### Against Defendants Bernfield, Bobins, Callen, Hill, Korman, Lowenthal, Perks, Pickett, and Plavin for Violations of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder

110.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's 2017 Proxy violated §14(a) and Rule 14a-9 because they omitted material information regarding the wrongdoing of defendants, and included by reference materially false and misleading financial statements.

112.    Specifically, in soliciting shareholders' votes to re-elect Defendants Bernfield, Bobins, Callen, Hill, Korman, Lowenthal, Perks, Pickett, and Plavin, the 2017 Proxy misleadingly suggested that the Board and the Audit Committee provided adequate oversight to properly identify, assess, and manage risks, and also to control exposure to financial risks.  In addition, the

2017 Proxy omitted any disclosures reflecting the known financial risks associated with the Company's second largest financial investment, Orianna.

113.    In the exercise of reasonable care, Defendants Bernfield, Bobins, Callen, Hill, Korman, Lowenthal, Perks, Pickett, and Plavin should have known that the 2017 Proxy contained misleading information and/or omitted material information.

114.    The misrepresentations and omissions in the 2017 Proxy were material to Company shareholders in voting on the 2017 Proxy.

115.    The Company was damaged as a result of the Defendants Bernfield, Bobins, Callen, Hill, Korman, Lowenthal, Perks, Pickett, and Plavin's material misrepresentations and omissions in the 2017 Proxy.

## COUNT II

### Against Defendants for Breach of Fiduciary Duty

116.    Plaintiff incorporates by reference and every allegation contained above, as though fully set forth herein.

117.    Defendants owed and owe Omega fiduciary obligations. By reason of their fiduciary relationships, the Defendants owed and owe Omega the highest obligation of good faith, loyalty, and due care.

118.    Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Omega shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

119.    During the course of the discharge of their duties, Defendants knew or recklessly

disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Omega to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Omega and its shareholders.  As a result, Defendants grossly mismanaged the Company.

120.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

121.    Plaintiff, on behalf of Omega, has no adequate remedy at law.

## COUNT III

### Against Defendants for Abuse of Control

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Omega and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the Company's financial health.

124.    As such, Defendants have abused their positions of control with the Company and are legally responsible.

125.    Thus, for the aforementioned reasons, Defendants are liable to the Company for their wrongdoing.

## COUNT IV

### Against Defendants for Gross Mismanagement

126.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

127.    Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

128.    Through the wrongful acts complained of herein, Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

129.    By committing the misconduct alleged herein, Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Omega's affairs and in the use and preservation of Omega's assets.

130.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Omega to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Omega, thus breaching their duties to the Company.

131.    As a result, Defendants grossly mismanaged Omega and should be liable to the Company for the resulting damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Omega and that Plaintiff is an adequate representative of the Company;

B.     Determining and awarding to Omega the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

C.     Directing Omega and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Omega and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

> (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

> (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

D.     Determining and awarding to Omega exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

E.     Awarding Omega restitution from defendants, and each of them;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 22, 2018

Respectfully submitted,

**LIFSHITZ & MILLER LLP**

Joshua M. Lifshitz
Email: jml@jlclasslaw.com
Edward W. Miller
Email: edmilleresq@aol.com
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

## **VERIFICATION**

I, Steve Schnipper hereby declare as follows:

     I am shareholder of OHI and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on 08/10/2018

Signature